IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
NORTHERN DIVISION

| | |
|---|---|
| IN RE THE APPLICATION OF ) | |
| OSMIN MANUEL GUARDADO ) | |
| ORELLANA, ) | |
| ) | |
| Plaintiff/Petitioner, ) | |
| ) | |
| v. ) | Civil Action File No. 3:16-CV-00444 |
| ) | |
| FIAMA MAGDALENA VELASQUEZ ) | |
| CARTAGENA, ) | |
| ) | |
| Defendant/Respondent. ) | |
| _____ ) | |

## PLAINTIFF'S TRIAL BRIEF

Petitioner Osmin Manuel Guardado Orellana ("Petitioner"), by and though counsel, respectfully submits this Trial Brief ("Brief") pursuant to the Order entered March 23, 2017 [Dkt. No. 42]. This Brief focuses on the question of whether the parties' minor child, Nathaly Abigail Guardado Velasquez (the "Child"), should be returned to Honduras pending a custody determination by Honduran court or agreement of the parties.

### I. INTRODUCTION

1. This case is before the Court on the Verified Complaint and Petition for Return of Child filed on July 13, 2016 (the "Verified Complaint") by Petitioner pursuant to the Convention on the Civil Aspects of International Child Abduction, done at the Hague Convention on October 25, 1980, T.A.I.S. No. 11,670 (the "Hague Convention") and its implementing legislation in the United States, the International Child Abduction Remedies Act, 22 U.S.C. § 9001, *et seq*. ("ICARA").

2. The Hague Convention is specifically not a parental custody determination between the parents. Instead, it is simply a determination of where the child should reside until such a determination can be legally made. It is a reciprocal agreement between countries with strong public policies of recognizing parental rights of both parents, the interest of the home country in not having its children wrongfully abducted thus eviscerating its laws and court orders, and recognizing the inherent risk of its children being moved to and living illegally in another country.

3. In the Verified Complaint, Petitioner sets out the elements necessary to meet the *prima facie* case that: (1) Honduras is the habitual residence of the Child; (2) the Respondent wrongfully removed the Child to the United States; (3) the Respondent continues to wrongfully retain the Child in the State of Tennessee without Petitioner's consent; and (4) the Child is under the age of sixteen.

4. Respondent Fiama Magdalena Velasquez Cartagena ("Respondent") filed her Answer on February 16, 2017 and asserted the grave risk and public policy affirmative defenses [Dkt. No. 34].

## II. FACTS

5. Petitioner expects to show the following facts at trial supporting entry of judgment ordering the Child to return to Honduras.

6. On November 14, 2013, Respondent gave birth to the Child in El Progresso, Yoro, Honduras.

7. Petitioner and Respondent are the parents of the Child. Petitioner and Respondent have never been married but periodically lived together in El Progresso, Yoro, Honduras from the Child's birth until the Child was removed from Honduras by the Respondent.

8. Petitioner, Respondent and the Child occasionally lived together at Petitioner's familial residence of Colonia Lorenzo Zelaya, Aldea Las 40 El Progresso, Yoro, Honduras. They lived together with Respondent's son from a prior relationship with Mr. Carlos Garay ("Mr. Garay").

9. Mr. Garay is the Respondent's first cousin. Respondent has two children with Mr. Garay, including one child conceived and born after Respondent moved to the United States. Mr. Garay is currently married to but separated from his wife, Natali Garay.

10. Prior to her removal, the Child lived exclusively in Honduras.

11. While living in Honduras, the Child received financial support from Petitioner, medical attention and vaccinations, attended church with Petitioner, and celebrated holidays such as the Child's birthday.

12. Petitioner learned that Respondent had wrongfully removed the Child when Petitioner received a phone call from Respondent's sister on September 11, 2015 stating that Respondent had left Honduras with the Child and was moving to the United States.

13. Respondent and the Child were stopped at the United States and Mexican border and are awaiting a hearing on Respondent and the Child's applications for asylum. Respondent crossed the United States and Mexican border knowing that it was illegal and with the help of a "coyote" paid for by Mr. Garay.

14. The next day Petitioner filed a complaint with the National Directorate of Criminal Investigation reporting the abduction of the Child.

15. In the days following the Child's abduction, Respondent contacted Petitioner and notified Petitioner that she had left for the United States of America with the Child to provide financial assistance and support for her parents.

3

16. During several phone conversations, Petitioner pleaded with Respondent to return the Child to Honduras but Respondent refused.

17. The Respondent's abduction of the Child from Honduras was done without Petitioner's consent or acquiescence.

18. On August 3, 2015, Petitioner contacted the commissioner of the International Police (INTERPOL) to report the Child's abduction and to have an immigration alert issued for the Respondent and the Child.

19. The Child currently resides with Respondent and Mr. Garay, who is Respondent's cousin, in Knoxville, Tennessee.

20. On December 1, 2015, Petitioner's Request for Return of the Child was submitted to the United States Department of State through the Government of Honduras.

21. Petitioner denies any accusations or assertions of mistreatment or physical, emotional or psychological abuse of Respondent or the Child. Further, Petitioner denies any accusations or assertions of mistreatment or physical, emotional or psychological abuse by Petitioner's family of Respondent or the Child. Moreover, Petitioner has produced a clean criminal record report, dated November 17, 2015.

22. Petitioner further expects the evidence to show that Respondent has fabricated allegations of physical and psychological abuse to gain entry into the United States to be with Carlos Garay or, at minimum, received assistance from someone who fabricated such evidence.

23. Since the Child's removal and throughout the pendency of this case, Petitioner has tried to maintain regular contact with the Child.

### III. LAW AND ARGUMENT

**A. The *Prima Facie* Case under the Hague Convention Is Straight Forward, Being Proven by Showing Only Four Elements: (1) the Habitual Residence of the Child;**

4

**(2) the Petitioning Party Had Custody Rights over the Child; (3) the Petitioning Party Exercised His or Her Custody Rights over the Child; and (4) the Child Is under the Age of Sixteen.**

24. In an ICARA case for the return of a child, the Petitioner has the burden of showing "by a preponderance of the evidence . . . that the child has been wrongfully removed or retained within the meaning of the [Hague] Convention." 22 U.S.C. § 9003(e)(1)(A).

25. The Hague Convention states that removal of a child is wrongful when the petitioner can establish that the removal or retention breached the rights of custody attributed a person under the law of the State in which the child was *habitually resident immediately before the removal or retention* and that custody rights were actually being exercised at the time of removal. *See* Hague Convention, Art. 3 (emphasis added).

26. The Hague Convention also only applies to children under the age of sixteen, and an action under the Hague Convention must be brought within one year of the date of the wrongful removal.[1] *See* Hague Convention, Art. 4, 12.

### i. The Child Was a "Habitual Resident" of Honduras Immediately Prior to Removal.

27. The Child was a "habitual resident" of Honduras prior to the Child's removal from Honduras because the Child had a settled purpose in Honduras and cannot be considered to be habitually resident anywhere else.

28. The Hague Convention does not define "habitual residence," but the Sixth Circuit has focused primarily upon the child's acclimation and past experiences in a specific location. *See Friedrich v. Friedrich*, 983 F.2d 1396, 1400-01 (6th Cir. 1993) (citing to a British court's

---

[1] The one year time period for bringing an action under the Hague Convention is not part of the Petitioner's *prima facie* case; instead, it is a defense that may be alleged by the Respondent as part of the "well-settled" affirmative defense. *Duarte v. Bardales*, 526 F.3d 563, 569 (9th Cir. 2008); *see* Hague Convention, Art. 12. Nonetheless, as stated previously in this Brief, the Child was wrongfully removed from Honduras on or about September 11, 2015, and this lawsuit was filed on July 13, 2016. Accordingly, the affirmative defense does not apply and has not been alleged in Respondent's Answer.

5

interpretation of "habitual residence" as requiring a factual determination on a case-by-case basis) ("*Friedrich I*"). The Sixth Circuit emphasized that the determination of the habitual residence requires a focus on the child, not the parents, and pertains primarily to "the customary residence prior to the removal." *See id.* at 1401. The *Friedrich I* court also determined that one's habitual residence can only be altered by the passage of time in a new location; however, the change in the child's location must take place before the wrongful removal. *See id.* at 1401-02 (stating that if the Court were to determine that a wrongful removal could alter the child's habitual residence, the Hague Convention would be rendered meaningless).

29. As a baseline, the United States cannot be considered to be the Child's habitual residence under *Friedrich I* because the Child never resided in the United States prior to her wrongful removal to the United States. *See id.*

30. Additionally, courts have typically viewed pending asylum applications as weighing against a finding of habitual residence in the United States because the child's connections to the United States could be unhinged by the denial of the child's asylum application. *See Miltiadous v. Tetervak*, 686 F. Supp. 2d 544, 522 n.9 (E.D. Pa. 2010); *Arguelles v. Vazquez (In re Hague Abduction Application),* No. 08–2030, 2008 WL 913325, at *11 (D. Kan. 2008).

31. The evidence at trial will show that the Child was born on November 14, 2013 and continuously resided in Honduras prior to her wrongful removal. On or about September 11, 2015, the Child was removed from Honduras and began traveling with Respondent to the United States. The Child only resided in Honduras prior to her removal to the United States.

32. The evidence will also show that the Child's family and extended family, with the exception of Respondent, all reside in Honduras. During the Child's residence in Honduras, the

6

Child was involved in activities in the community, including regular attendance at church. The Child received medical attention and vaccinations in Honduras, and the Child also received some financial support from Petitioner and the Child's extended family.

33. Last, the evidence will likely show that Respondent and the Child's applications for asylum in the United States are pending but have not been granted.

34. The above facts lead to the simple conclusion that the Child's habitual residence was Honduras. The Child resided in Honduras exclusively until the Child's mother removed her to the United States on September 11, 2015; therefore, the Court should hold that the Child was a habitual resident of Honduras at the time of her removal. *Friedrich*, 983 F.2d at 1402.

### ii. Petitioner Had Custody Rights over the Child Prior to Her Removal, and Petitioner Actually Exercised Custody of the Child Prior to Her Removal.

35. Petitioner had custody rights over the Child prior to her removal, and Petitioner actually exercised his custody rights over the Child at the time of the Child's removal.

#### a. Petitioner Had Custody Rights over the Child under Honduras Law.

36. Petitioner had custody rights over the Child under Honduras law. Under the Hague Convention, "rights of custody" are "rights relating to the care of the person and the child and, in particular, the right to determine the child's place of residence." Hague Convention, Art. 5(a). Custody rights over the child may arise in several ways, including by, among other things, operation of law. *Id.* at Art. 3.

37. The Honduras Family Code provides that parental authority belongs to both parents jointly unless a Honduran court has bestowed parental authority upon only one parent or it is impossible for one parent to exercise parental authority. Honduras Family Code, Art. 187.[2]

---

[2] Centro Electónico de Documentación e Información Judicial, Codigo de Familia, http://www.poderjudicial.gob.hn/juris/Leyes/Codigo%20de%20Familia%20(actualizada-07).pdf (last visited April 4, 2017).

Parental authority includes, among other things, the right to exercise care and custody over the child. *Id.* at Art. 186.

38. Here, Petitioner has not been stripped of his custody rights by judicial or administrative order in Honduras because no custody proceedings regarding the Child have been filed in Honduras by Respondent, Petitioner, or anyone else. Further, no formal custody agreement has been executed between the parties with respect to the Child and Petitioner was and is capable of exercising custodial rights over the Child.

### b. Petitioner Exercised His Custody Rights over the Child Prior to Removal.

39. To prove wrongful retention, the petitioning party must also show that at the time of removal or retention the petitioning party was actually exercising its custody rights, either jointly or alone. *See* Hague Convention, Art. 3(b).

40. The court in *Friedrich v. Friedrich* considered whether the petitioner properly exercised custody rights. 78 F.3d 1060, 1065-66 (6th Cir. 1996) ("*Friedrich II*"). The court in *Friedrich II* stated that courts should liberally find an exercise of custodial rights when a parent seeks to keep any sort of regular contact with his or her child and attempts to maintain a regular relationship with the child. *See id.* At least one court has found that solely living at the same address and providing for the child's basic needs constituted exercise of custodial rights. *See Aldinger v. Segler*, 263 F. Supp. 2d 284, 289 (D.P.R. 2003). Other courts have found an exercise of custodial rights in situations involving less interaction between the parent and child. *See, e.g.*, *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 334-35 (5th Cir. 2004) (finding error in the district court's conclusion that the father failed to exercise custody rights where the father visited his children weekly and regularly paid child support to the mother); *Giampaolo v. Erneta*, 390 F. Supp. 2d 1269, 1279–80 (N.D. Ga. 2004) (finding exercise of custodial rights where the father

would take the child to and from school, chose the child's school, and paid for some of the child's private school education).

41. Rather significantly, the court in *Friedrich II* held that "if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention *short of acts that constitute clear and unequivocal abandonment* of the child." *Friedrich II*, 78 F.3d at 1066 (emphasis added).

42. The evidence at trial will show that the Child periodically lived with Petitioner at his residence at Colonia Lorenzo Zelaya, Aldea Las 40 El Progresso, Yoro, Honduras, and Petitioner regularly visited with the Child and provided for the Child's basic needs, including food, medication and financial support. The Petitioner also exercised custodial rights by taking the Child to church. The evidence at trial will fall exceedingly short of showing that Petitioner clearly and unequivocally abandoned the Child.

43. Accordingly, the evidence at trial should show that Petitioner exercised his custodial rights prior to the Child's removal from Honduras.

### iii. The Child is under the Age of Sixteen.

44. The Hague Convention ceases to apply once the child at issue reaches the age of 16 years. Hague Convention, Art. 4. Here, the Child was born on November 14, 2013 and thus the Child is under the age of 16 years—she is three years old. Accordingly, the Hague Convention applies to the wrongful removal of the Child.

**B. Once the *Prima Facie* Case Is Made, the Hague Convention Provides for Few Defenses that Defeat Return of the Child. The Statute Is so Favorable to Return the Child that the Grave Risk Defense Must be Proven by Clear and Convincing Evidence.**

9

45. Respondent will not be able to show by clear and convincing evidence that returning the Child to Honduras presents a grave risk to the Child of physical or psychological harm or otherwise places the Child in an intolerable situation.

46. The burden of proving the grave risk defense falls on the respondent, and the respondent must prove the grave risk defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A); Hague Convention, Art. 13(b).

47. Pursuant to Article 13, the State is not bound to order return of the child if the respondent establishes that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Art. 13(b).

48. The court in *Friedrich II* explained that the grave risk defense applies in two situations: (1) where the child is put in grave risk of harm before the custody dispute can be resolved; and (2) where there is a grave risk that the child will face "serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling" to protect the child. *Friedrich II*, 78 F.3d at 1069.

49. The court in *Friedrich II* also explained that if the return of the child to the parent in the home country is considered dangerous, the court can expect the home county's courts to respond accordingly. *Id.* at 1068 (citing *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995) (stating that if a parent is abusive, the Mexican court can institutionalize the child during the pendency of the custodial proceedings)).

50. In the situation where abuse is alleged, courts must look to whether the abuse rises above the level of "serious" to that of presenting a "grave" risk. *See Danaipour v.*

10

*McLarey*, 286 F.3d 1, 14 (1st Cir. 2002) (stating that "grave" means more than a "serious risk" under Article 13(b)); *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 377 (8th Cir. 1995); *In re D.D.*, 440 F. Supp. 2d 1283, 1298 (M.D. Fla. 2006).

51. Moreover, the *McManus v. McManus* court stated that "[e]vidence of real but sporadic or isolated incidents of physical abuse, or of some limited incidents aimed at persons other than the child at issue, have not been found sufficient to support application of the 'grave risk' exception." 354 F.Supp.2d 62, 70 (D. Mass. 2005) (citing *Whallon v. Lynn*, 230 F.3d 450, 460 (1st Cir. 2000)).

52. In evaluating whether an intolerable situation awaits the child in the home country, courts often evaluate the home county's stability, the people awaiting the child in the home country, the circumstances awaiting the child in the home country, and any grave abuse that the child would face upon return. *See Friedrich I*, 983 F.2d at 1069; *In re D.D.*, 440 F. Supp. 2d at 1298-99.

53. Here, Petitioner is expected to testify that neither the Child nor the Respondent were subjected to physical, emotional or psychological abuse by Respondent or Respondent's family. Moreover, Petitioner is expected to testify that the Child's entire extended family resides in Honduras with the exception of Respondent and Respondent's sister. Petitioner also expects that the evidence will show that Respondent has not previously sought relief from the courts related to any allegations of physical or psychological abuse. Accordingly, Respondent cannot adequately support her grave risk defense by clear and convincing evidence.

**C. Respondent Will Not Be Able to Show by Clear and Convincing Evidence that Returning the Child to Honduras Violates Any Public Policy.**

54. Respondent will not be able to show by clear and convincing evidence that returning the Child to Honduras violates public policy.

11

55. The burden of proving the public policy defense falls on the respondent, and the respondent must prove the public policy defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A); Hague Convention, Art. 20.

56. Article 20 of the Hague Convention provides that the return of a child "may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, Art. 20.

57. The public policy defense is to be applied on the "rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 614 (E.D. Va.) (quoting Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10494, 10510 (1986)).

58. Moreover, at least one source has indicated that the Article 20 public policy defense has never been successfully invoked in the United States. *See* Kilpatrick Townsend & Stockton LLP, Litigating International Child Abduction Cases Under the Hague Convention 65 (2012) (explaining that the defense has been invoked with success abroad when the constitutionality of the Hague Convention was challenged).

59. Here, no facts have been put forth in answers to discovery showing that any of the United States' public policies would be offended by returning the Child to her habitual residence.[3] In short, Article 20 simply does not apply to the facts of this case.

**D.  The Best Interest of the Child Is Not an Issue Before This Court and Is Not to Be Considered as a Defense in a Return Case under the Hague Convention.**

---

[3] Respondent has produced documents in discovery indicating that the Child and Respondent have pending applications for asylum in the United States. Courts addressing situations involving pending applications for asylum in the context of return case under the Hague Convention have suggested that a pending asylum application does not strip the reviewing court of jurisdiction or authority to order the return of the Child. *See Miltiadous v. Tetervak*, 686 F. Supp. 2d 544, 522 n.9 (E.D. Pa. 2010); *Arguelles v. Vazquez (In re Hague Abduction Application),* No. 08–2030, 2008 WL 913325, at *11 (D. Kan. 2008).

60. The best interest of the Child is not an issue before this Court and is not to be considered as a defense in a return case under the Hague Convention.

61. Reviewing courts warn against courts delving into issues of the underlying custody dispute and the best interest of the child.

62. A countless number of courts have cautioned against such an approach because the best interest of the child is *not* an issue to be considered in determining the outcome of a return case under the Hague Convention and is certainly not recognized as a valid defense in a Hague Convention case. *See Friedrich II*, 78 F.3d at 1063, 1069 (stating "a court in the abducted-to nation has jurisdiction to decide the merits of an abduction claim, but not the merits of the underlying custody dispute"); *Guevara v. Soto*, 180 F. Supp. 3d 517, 525 (E.D. Tenn. 2016); *Danaipour*, 286 F.3d at 14.

63. Accordingly, Petitioner respectfully requests that this Court refrain from transforming this Hague Convention return case into a custody proceeding.

### IV. WITNESSES

64. In support of the aforementioned facts, Petitioner expects to call the following witnesses at trial: (1) Petitioner Osmin Manuel Guardado Orellana via videoconferencing, and (2) Natali Garay via deposition testimony to be introduced at trial.

65. Generally, Petitioner is expected to testify about the Child's life in Honduras prior to her removal, the Petitioner's involvement in the Child's life and Petitioner's treatment of the Child and Respondent, and the circumstances surrounding the Child's removal from Honduras.

66. Counsel for Petitioner also plans to read into evidence portions of Natali Garay's deposition concerning the circumstances surrounding Respondent's entry into the United States,

the Respondent's treatment of the Child in the United States and the alleged mistreatment of the Respondent and the Child by Petitioner. Natali Garay is expected to be unavailable at trial.

Respectfully submitted this the 4th day of April, 2017

**HUSCH BLACKWELL, L.L.P.**

By: */s/ Jennifer Ziegenhorn*
Jennifer Ziegenhorn, BPR No. 016351
Ryan A. Burgett, BPR No. 33641 (*Pro Hac Vice*)
Jennifer.Ziegenhorn@huschblackwell.com
Ryan.Burgett@huschblackwell.com

1661 International Drive, Suite 300
Memphis, Tennessee 38120
(901) 523-1123
(901) 523-7472 *facsimile*

**ATTORNEYS FOR PETITIONER**

## CERTIFICATE OF SERVICE

  I hereby certify that a true and correct copy of the forgoing instrument was delivered via the Electronic Case Filing (ECF) system on April 4, 2017.

                */s/ Jennifer Ziegenhorn*
                Jennifer Ziegenhorn