UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| IN RE THE APPLICATION OF OSMIN MANUEL GUARDADO ORELLANA, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 3:16-CV-444-CCS |
| FIAMA MAGDALENA VELASQUEZ CARTAGENA, | ) ) ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

This case is before the undersigned pursuant to 28 U.S.C. § 636(c), Rule 73(b) of the Federal Rules of Civil Procedure, and the consent of the parties, for all further proceedings, including entry of judgment. [Doc. 40]

This matter is before the Court on Petitioner's Verified Complaint and Petition for Return of Child. [Doc. 1]. The Petition alleges that Respondent wrongfully removed his child from Honduras, and he seeks the return of his child to Honduras where an appropriate custody determination can be made by a Honduras court. Upon agreement of the parties, the Court entered several temporary restraining Orders [Docs. 4, 9, 17] to preserve the status quo pending resolution of the matter. The Court held an evidentiary hearing in this case on August 31, 2017, and the parties filed post-trial briefs [Docs. 60, 62, 64, 65]. Upon consideration of the parties' arguments, the evidence introduced in the record, and the relevant law, the Court **GRANTS** the Petition [**Doc. 1**] for the return of his child to Honduras.

## I. BACKGROUND

This litigation relates to the alleged wrongful removal from Honduras and retention of Petitioner's child (hereinafter, "Child") in the United States by the Child's mother, Respondent. [Doc. 1]. The parties do not dispute that Petitioner is the father of the Child, Respondent is the mother of the Child, and that Petitioner and Respondent have never been married. [Doc. 53 at ¶ 1]. Further, the parties do not dispute that the Child was born in Honduras on November 14, 2013, and that the Child resided solely in Honduras prior to her removal on or about September 11, 2015. [*Id.* at ¶¶ 2-3]. In addition, the parties agree that Respondent did not discuss the Child's removal from Honduras with Petitioner before the Child was removed, nor did Respondent receive a custody order from any Honduras court granting Respondent full custody of the Child. [*Id.* at ¶¶ 4-5].

Respondent alleges, however, that returning the Child to Honduras would pose a grave risk and that doing so would expose the Child to physical or psychological harm or otherwise place the Child in an intolerable situation. [Doc. 34 at 3]. In addition, Respondent argues that returning the Child would not be permitted by the fundamental principles relating to the protection of human rights and fundamental freedom. [*Id.*].

During the evidentiary hearing in this matter, four witnesses testified: (1) Osmin Manuel Guardado Orellana, (2) Natali Garay, (3) Fiama Magdalena Velasquez Cartagena, and (4) Carlos Garay. The Court will summarize the testimony of each witness.

### A. The Testimony of Osmin Manuel Guardado Orellana ("Petitioner")

Petitioner testified that he is a machinist at a palm oil plant. He stated that prior to the Child's removal, the Child lived with him and his family, including Respondent and Respondent's son from her prior relationship with Carlos Garay. Petitioner described his relationship with the

Child as a nice relationship and that the Child had a good relationship with Petitioner's mother and family. He continued that the Child would wait for Petitioner to get home from work and that they played together and watched television together. Petitioner testified that he provided food and clothing for the Child and that the Child attended church regularly with Petitioner. In addition, Petitioner stated that he and the Child celebrated birthdays together, including the Child's birthday, and they do activities together. Petitioner further testified that the Child visited the doctor frequently, she was healthy, and her shots were up to date. In support of his testimony, Petitioner submitted the Child's medical records, [Ex. B], and a photograph of Petitioner, Respondent and the Child that was taken on the Child's birthday. [Ex. C].

Petitioner testified that on September 11, 2015, Respondent left with the Child. He discovered that they were gone when Respondent's sister called and told him. Petitioner stated that a few days later, Respondent called him and stated that she had left in order to financially help her parents. Petitioner stated that he filed a complaint with the National Police on September 12, 2015. In addition, he testified that he filed complaints with INTERPOL and with the immigration police. Petitioner stated that he filed his complaints immediately because his Child is important to him and he was afraid for the Child's well-being.

Petitioner testified that since the Respondent has been in the United States, he has had limited contact with the Child. He continued that when Respondent arrived in the United States, she stated that she was living with an aunt. Petitioner stated that his contact with Respondent was more frequent when Respondent first moved to the United States. Petitioner stated that he stopped receiving telephone calls in December 2015. Respondent told Petitioner that she was in a relationship with Carlos Garay.

Petitioner stated that he is aware that Respondent has accused him of abuse. He continued that he is very surprised by the allegations and that he never hit Respondent or the Child. He repeated that he absolutely did not hit Respondent. Petitioner stated that he saw the photograph of Respondent's face [Ex. 2] and that the alleged bruises on her face were actually suck marks. He denied that the marks were made from punching Respondent. Petitioner stated that he took the photograph of Respondent. When asked whether he was aware that Respondent filed a police report against him, Petitioner stated that he was not aware of Respondent's actions at the time the police report was allegedly filed. He stated that he has never been arrested, nor was he questioned about the allegations made in the police report. He testified that the town, San Pedro Sula, where the police report was allegedly filed, is about two hours from his home. Petitioner testified that there are two police stations near his town: one that is located approximately ten minutes away and another located approximately twenty minutes away. Petitioner continued that he and an attorney went to the National Police and the Prosecutor's Office for Women to determine whether a complaint against him existed. Petitioner testified that no complaint had been registered with either organization. Petitioner testified that he could not independently determine or verify that the police report exists. Petitioner also stated that he went to the police department in San Pedro Sula, where the police report was allegedly filed. He was told that the police report did not exist.

Finally, Petitioner testified that if the Child is returned to Honduras, he is willing and able to take care of her. He continued that he will abide by a Honduras court custody determination.

**B.    Testimony of Natali Garay**

Natali Garay testified that she is the wife of Carlos Garay, although they have been separated for two years. She stated that when Respondent arrived in Knoxville, Tennessee, she stayed with Mr. Garay's mother and sister. Ms. Garay stated that Respondent never mentioned

that she was physically abused or mistreated by Petitioner. Ms. Garay stated that she has seen Respondent yell at the Child in Spanish that she (Respondent) was going to splat the Child's head against the wall.

Ms. Garay testified that Carlos Garay and Respondent planned to be together before Respondent arrived. She continued that Carlos Garay provided Respondent money to travel to the United States and that she heard Carlos Garay speaking to a coyote. She further testified that the Defendant provided a fake police report to immigration authorities and that she (Ms. Garay) saw blank documents through a video that "they" sent on WhatsApp.[1] Ms. Garay stated that Carlos Garay left her to be with Respondent in November 2015.

### C. Testimony Fiama Magdalena Velasquez Cartagena ("Respondent")

Respondent testified that she was born in Honduras, El Progresso, Yuro. She stated that her parents live in El Progresso. She has two children with Carlos Garay. The oldest is seven years old, and the youngest is almost one year old. She also has a Child with Petitioner. She attended school to be a nurse, and she worked three years as a nurse and one year for a pediatrician. She testified that when she became pregnant with the Child, Respondent denied that he was the father. After seven months, he began to take responsibility of the pregnancy. Respondent testified that Petitioner did not live with her during that time but that he helped with the finances. She stated that after the Child was born, she (Respondent) and the Child moved in with Petitioner and his family, including his father and two sisters. Respondent stated that after the Child was born, she went back to work for a doctor for about a year.[2] She testified that she eventually lost her job because Petitioner made her late to work. She testified that Petitioner never took care of the Child

---

[1] It is not clear to the Court who Ms. Garay was referring to when she referenced "they."

[2] Petitioner testified that Respondent went back to work for a week.

or took an interest in the Child.  She claimed that when Petitioner got home from work, he went to the gym and that they only went to church one time.  Respondent stated that Petitioner would scream at Respondent to make the Child stop crying.  She testified that Petitioner pulled her son's ears.  Respondent also stated that Petitioner slapped the Child on the back.  Later, however, on cross examination, she testified that he pushed the Child to the side but that he had never hit the Child.

Respondent continued that Petitioner was violent toward her and that he grabbed her by the face.  When shown the photograph of Respondent's face [Ex. 2], she denied Petitioner's statement that they were just playing.  Respondent stated that she actually took the photograph and sent it to her sister because the abuse was becoming more frequent.  Respondent testified that she and Petitioner started arguing and he hit her on the leg.  Respondent called her brother, and her brother picked her up.  She filed the police report in San Pedro Sula.  When asked why she filed the police report in San Pedro Sula, she testified that San Pedro Sula is where her mother lives.  She stated that San Pedro Sula is approximately two hours from El Progresso.  She testified that she wanted Petitioner to be arrested but that she did not provide Petitioner's address to the police.  When asked why the police report states, "his two children," Respondent stated that her son was used to calling Petitioner "daddy."

After she filed the police report, she stayed with her mother for three days and then returned to Petitioner's house.  Respondent stated that she did not tell Petitioner about the police report in fear that he would hit her again.  She stayed with Petitioner for approximately seven days.  On September 11, 2015, she left Honduras with her son and the Child.  She explained that she suddenly decided to leave Honduras with her children.  She explained that she left the same day that she

thought about leaving. She continued that she came along with another female and had to travel through Mexico. She testified that she did not have a sponsor or plan to travel to the United States.

Respondent entered the United States on September 30, 2015. [Ex. 3]. During a credible fear interview, she claimed that the first time Petitioner hit her was when she was pregnant with the Child and that the last time he hit her was in September. [*Id.*]. With respect to the incident occurring while she was pregnant, Respondent stated that Petitioner hit her on the back of her legs on her calves. [*Id.*]. The next time he physically mistreated Respondent was in September when he hit Respondent in the face. [*Id.*]. Respondent stated that Petitioner pinched her and that he also verbally abused her, including making a death threat. [*Id.*].

Respondent testified that she called Mr. Garay when she was in the shelter. She continued that she provided Mr. Garay's name as someone she would stay with if released because Mr. Garay is the father of her first child. *See* [Ex. 3]. Respondent testified that she arrived in Knoxville on October 31, 2015. She came to Mr. Garay's house, but it was better to live with Mr. Garay's mom and sister. Respondent testified that she became pregnant by Mr. Garay in February 2016.

### D. Testimony of Carlos Alberto Garay

Mr. Garay testified that Respondent contacted him when she was detained at the border. He paid for Respondent's plane tickets. When Respondent arrived, she stayed with Mr. Garay's family. At that time, they did not have a relationship. Their relationship began in January 2016 or February 2016. Respondent and Mr. Garay had another child who was born in October 2016.

## II. ANALYSIS

The Court has considered the parties' positions and the evidence entered during the trial in this case. Accordingly, the Court finds that Petitioner has established by a preponderance of the evidence that the Child was wrongfully removed and retained in breach of Petitioner's custody

rights.  Further, the Court finds that Respondent has not established by clear and convincing evidence that there is a grave risk that returning the Child would expose her to physical or psychological harm or otherwise place her in an intolerable situation, nor has Respondent established by clear and convincing evidence that returning the Child would not be permitted by the fundamental principles of the United States.

Before turning to the merits of this case, the Court will address Respondent's reliance on her brother's affidavit [Doc. 25 at 6].  Respondent states that her brother's affidavit corroborates her version.  [Doc. 61 at 6].  Petitioner argues that the affidavit was not submitted at trial and that it is inadmissible to corroborate Respondent's version.  [Doc. 64 at 2].  Petitioner submits that Respondent's brother had the opportunity to testify at trial or by deposition following the trial but failed to do so.  [*Id.*].  Further, Petitioner argues that he has not had an opportunity to cross examine Respondent's brother and that the affidavit constitutes hearsay.  [*Id.*].  Citing to 22 U.S.C. § 9005, Respondent replies that documents attached to the pleadings are to be considered.  [Doc. 65 at 2].

Pursuant to 22 U.S.C. § 9005:

> With respect to any application to the United States Central Authority, or any petition to a court under section 9003 of this title, which seeks relief under the Convention, or any other documents or information included with such application or petition or provided after such submission which relates to the application or petition, as the case may be, no authentication of such application, petition, document, or information shall be required in order for the application, petition, document, or information to be admissible in court.

The above statute speaks only to authentication, not to hearsay.  Petitioner has objected on hearsay grounds, and Respondent has not responded to this objection.  Further, the Court has reviewed the affidavit and finds that it is hearsay.  Accordingly, the Court finds the affidavit [Doc. 25 at 6] inadmissible.

The Court will now turn to the Petition for the Return of the Child.

    A.    **Overview of the International Child Abduction Remedies Act**

The Petition for Return of Child arises under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011, which is a codification of the Hague Convention. *Guevara v. Soto*, 180 F. Supp. 3d 517, 523 (E.D. Tenn. 2016) (citing *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001)). The objectives of the Hague Convection are "to secure the prompt return of children wrongfully removed or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of the Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1; *Guevara*, 180 F. Supp. 3d at 523. The preamble to the Hague Convention explains that it is the signatories' desire to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, pmbl; *Guevara*, 180 F. Supp. 3d at 523. The United States and Honduras are both signatories of the Hague Convention. *See Hernandez v. Garcia Pena*, 820 F.3d 782, 786 (5th Cir. 2016).

"ICARA grants state and federal district courts concurrent jurisdiction over claims arising under the Hague Convention." *Guevara*, 180 F. Supp. 3d at 523 (citing 22 U.S.C. § 9003(a)). The Court's role is not to make a custody determination; instead, the Court will only determine the country that should hear the underlying custody dispute. *Id.* (citing *Friedrich v. Friedrich*, 78 F.3d 1060, 1063 (6th Cir. 1996)) (other citations omitted). A petitioner has the burden of demonstrating by a preponderance of evidence that a child was "wrongfully removed or retained in breach of his custody right under the laws of the Contracting State" in which the child habitually resided before the child was removed or retained. 22 U.S.C. § 9003; *Ahmed v. Ahmed*, 867 F.3d

682, 687 (6th Cir. 2017).  If a petitioner is able to establish that a child was wrongfully removed or retained, then the child must be returned to the country of the child's habitual residence, unless the respondent can establish certain exceptions under ICARA.  Hague Convention, arts. 12, 13, 20; *Guevara*, 180 F. Supp. 3d at 523-24.

The relevant exceptions in the instant matter require Respondent to demonstrate: (1) by clear and convincing evidence that there is a grave risk that returning the Child would expose her to physical or psychological harm or otherwise place the Child in an intolerable situation, Hague Convention, art. 13(b); or (2) by clear and convincing evidence that returning the Child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, art. 20; 22 U.S.C. § 9000(e).  The Sixth Circuit, however, has described these exceptions as "narrow" because the Hague Convention "is generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court."  *Guevara*, 180 F. Supp. 3d at 524 (quoting *Panteleris v. Panteleris*, 601 F. App'x 345, 347 (6th Cir. 2015)) (other citations omitted).

With the above guidance in mind, the Court will now turn to the issues in the present matter. The Court will first address whether Petitioner has established that the Child's removal and retention is wrongful.  The Court will then address Respondent's affirmative defenses.

### B.    Wrongful Removal or Retention

As mentioned above, pursuant to the Hague Convention, a petitioner must establish by a preponderance of evidence that the child's removal or retention was wrongful.  22 U.S.C. § 9003(e)(1).  Wrongful removal simply means taking the child "from the person who was actually exercising custody of the child," and wrongful retention involves "keeping the child without the consent of the person who was actually exercising custody." *March*, 136 F. Supp. 2d at 835 (citing

51 Fed. Reg. 10494, 10503 (1986) (International Child Abduction Convention; Text and Legal Analysis)). In order to establish wrongful removal, a petitioner must show that the child was removed from the country of his/her habitual residence. *Guevara*, 180 F. Supp. at 525. In addition, a petitioner must establish the removal was in breach of petitioner's custody rights pursuant to the laws of the country of the child's habitual residence and that the petitioner was actually exercising those custody rights. *Id.* (citing Hague Convention, art. 3) (other citations omitted).

### 1. Habitual Residence

The term "habitual residence" is the country where, prior to removal or retention, "the child has been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's perspective.'" *Jenkins v. Jenkins*, 569 F.3d 549, 556 (6th Cir. 2009) (quoting *Robert v. Tesson*, 507 F.3d 981, 993 (6th Cir. 2007)) (other quotations omitted).

In the present matter, the parties have stipulated that the Child was born in Honduras and that the Child resided solely in Honduras prior to her removal on or about September 11, 2015. [Doc. 53 at ¶¶ 2-3]. Moreover, the testimony at the hearing was consistent with the parties' stipulation. Accordingly, because the Child was born and raised in Honduras prior to her removal to the United States, the Court finds that Honduras is the Child's habitual residence.

### 2. Custody Rights

"When no formal custody agreement exists between the parents, courts must apply the laws of the country of the child's habitual residence to determine if the non-removing parent had 'rights of custody' within the meaning of the Convention." *Sierra v. Tapasco*, No. 4:15-CV-00640, 2016 WL 5402933, at *7 (S.D. Tex. Sept. 28, 2016), *aff'd*, 694 F. App'x 957 (5th Cir. 2017). Pursuant to Honduras law:

> The exercise of parental authority corresponds jointly to both parents. However, only one of them shall exercise such parental

> authority when it is conferred by a court ruling or it is impossible for the other parent to exercise such authority. In this case, the minor shall reside with the parent who has parental authority. When there is any disagreement with the father and the mother as to the exercise of parental authority, a competent court shall decide what is in the best interest of the welfare of the minor. The judge will hear the opinions of experts when he deems it convenient. Professionals or technical staff from agencies or State agencies are required to provide advise free of charge to the judge when he seeks their opinion.

[Doc. 1-1 at 60; art. 187].[3]    The parties agree that Respondent did not receive a custody order from any Honduras court granting Respondent full custody of the Child.  [Doc. 53 at ¶ 5]. Accordingly, because Petitioner is the Child's father, the Court finds that he has proven by a preponderance of the evidence that, under Honduran law, both he and Respondent have custody rights over the Child.  *See Guevara,* 180 F. 3d at 517 (finding that pursuant to Mexican law, parents will jointly exert parental authority and responsibility, and therefore, plaintiff established he and the defendant had custody rights over the child).

As mentioned above, Petitioner must also establish that he was exercising his custody rights prior to the removal of the Child.  The Hague Convention has not defined "exercise." *Friedrich*, 78 F.3d at 1065.  In the absence of a definition, however, the Sixth Circuit has provided the following guidance:  "The only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a party with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child."  *Id.* Further, and pursuant to Honduran law:

> The obvious status of son/daughter consists of parents who have treated them as such, giving or allowed them to carry/bear their names (last name), maintained and educating them in a competent way and presenting them to society as such and considering and

---

[3] The parties have stipulated that Exhibit L attached to the Complaint accurately sets out Honduran law.  [Doc. 53 at ¶ 11].

recognizing them in society as their child for a period of not less than one year.

[Doc. 1-1 at 59, art. 109]. Further, Article 186 explains that "[p]arental authority includes, among other rights and obligations, the legal representation of the child, exercise their guardianship and care; feed, help, and educate them, and to manage their property." [*Id.*].

Pursuant to Honduran law and the Sixth Circuit's instruction to liberally find that a parent is exercising his/her rights whenever the parent keeps or seeks to keep regular contact with the child, the Court finds that Petitioner has established by a preponderance of the evidence that he was actually exercising his custody rights prior to the removal. Respondent argues that Petitioner was not exercising his rights because he engaged in domestic violence and that Petitioner acquiesced to the removal by creating an intolerable situation. [Doc. 61 at 10, 13].[4] Respondent testified, however, that Petitioner never hit the Child, and as further explained below, there is no credible evidence that Petitioner harmed the Child psychologically or otherwise placed the Child in an intolerable situation. Respondent further argues that she saw to the medical care of the Child while in Honduras. [*Id.*]. Respondent, however, has not disputed Petitioner's testimony that the Child lived with him until the Child's removal, Petitioner provided food and clothing for the Child,

---

[4] The Court observes that Respondent vaguely raises in her Proposed Findings of Fact and Conclusions of Law [Doc. 61] that Petitioner acquiesced to the removal under Article 13(a) by his conduct in creating an intolerable situation. [Doc. 61 at 13]. Such an argument appears to combine two defenses: (1) acquiescence, which is established by a preponderance of the evidence, and (2) placing the Child in an intolerable situation, which is established by clear and convincing evidence. The Sixth Circuit has explained, however, that under Article 13(a), acquiescence requires: "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 10170. There was no testimony in this case regarding any acts or statements that would show the type of acquiescence as explained in *Friedrich*. Further, Article 13(a) provides that Respondent must show that Petitioner "*subsequently* acquiesced" to the removal or retention. Here, the alleged abuse occurred prior to the removal.

and that Petitioner and Child celebrated birthdays together. Accordingly, the Court finds that Petitioner was exercising his custody rights prior to the Child's removal.

### C. Statutory Defenses

As mentioned above, Respondent raises two statutory defenses: (1) there is a grave risk that returning the Child would expose her to physical or psychological harm or otherwise place the Child in an intolerable situation; and (2) returning the Child would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms. The Court will address these defenses separately.

### 1. Grave Risk

The grave risk defense provides that Respondent must demonstrate by clear and convincing evidence that returning the Child "would expose the child to physical or physiological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). The Sixth Circuit has elaborated as follows:

> First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute—*e.g.,* returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Friedrich,* 78 F.3d at 1069.

The Court has weighed the evidence in this case and finds that Respondent has not shown by clear and convincing evidence that there is a grave risk of harm in returning the Child to Honduras. The Court observes that Petitioner's and Respondent's testimonies paint a different picture of what family life was like in Honduras. As summarized above, Petitioner denied that he physically assaulted Respondent and claimed the photograph of Respondent's face [Ex. 2]

portrayed suck marks.  Petitioner claims that Respondent called him after she left and stated that she was leaving to financially help her parents.  Petitioner now suspects that Respondent left him to be with the father of Respondent's first child.

On the other hand, Respondent testified that Petitioner screamed at her to get the Child to stop crying.  In addition, Respondent stated that Petitioner pulled her son's ears.  She testified that Petitioner grabbed her, shook her, and kicked her in the back.  She continued that the marks on her face as shown in the photograph [Ex. 2] were made by Petitioner when he grabbed her face and that they were not playing.  She testified that the abuse was becoming more frequent and that she filed the police report after she and Petitioner started arguing and he hit her on the leg.  The police report [Ex. 1] characterizes Petitioner's abuse as violent and aggressive in various parts of Respondent's body and that the physical and verbal abuse happened very often and in front of the children.  She also describes two physical altercations in her credible fear interview [Ex. 3]: one occurring when Petitioner hit Respondent in the back of the calves when she was pregnant with the Child and the next incident in September when Petitioner hit Respondent in the face.  When asked, "Other than those two times, did he ever otherwise physically mistreat[] [you]?," Respondent stated, "Yes, he always said that I was stupid and just a dummy and not good for anything and he used to pinch me."  [Ex. 3].

The Court acknowledges that there is some support for both versions of the story and finds that the truth lies somewhere in the middle.  For instance, with respect to Petitioner's version (i.e., Respondent left him to be with the father of her first child), the Court finds Respondent's testimony regarding her journey from Honduras through Mexico to the United States questionable.  She testified that she immediately decided to leave with no plan, no sponsor, and with two small children.  Respondent stated in her credible fear interview, however, that she would stay with

Carlos Garay in Tennessee, if she were released. [Ex. 3]. Mr. Garay purchased plane tickets for Respondent to fly to Knoxville, Tennessee. Respondent arrived in Knoxville on October 31, 2015, and by February 2016, she was pregnant with Mr. Garay's child.[5]

With respect to Respondent's version (i.e., leaving Petitioner because she was physically and verbally abused), she has a photograph of what appears to be some marks on her face, although it is unclear if the marks are bruises, as alleged by Respondent, or suck marks, as alleged by Petitioner. She has stated consistently that Petitioner verbally and physically abused her, although the frequency and extent of the abuse are somewhat inconsistent. *Compare* [Ex. 1] (police report alleging violent and aggressive abuse occurring very often in front of the children) with [Ex. 3] (describing two physical assaults and pinching).

"Where allegations are made concerning physical abuse, it is axiomatic that the purposes of the Hague Convention are not furthered 'by forcing the return of children who were the direct or indirect victims of domestic violence.'" *Foster v. Foster*, 654 F. Supp. 2d 348, 351 (W.D. Pa. 2009) (quoting *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007)). In cases of domestic assault, the Sixth Circuit has delineated three broad categories of abuse situations: "First, there are cases in which the abuse is relatively minor. In such cases, it is unlikely that the risk of harm caused by return of the child will rise to the level of a '*grave* risk' or otherwise place the child in an '*intolerable* situation' under Article 13b." *Simcox*, 511 F.3d at 608. The second type of cases are those at the other end of the spectrum, "in which the risk of harm is clearly grave, such as where

---

[5] Natali Garay's testimony certainly supports Petitioner's version. However, given that Ms. Garay is biased (her husband left her to be with Respondent), the Court has not completely relied on her testimony. Further, much of her testimony was not corroborated. For instance, she testified that Respondent and Carlos Garay planned to be together before Respondent arrived. It is unclear to the Court how she knew of their alleged plans. She also testified that "they" sent fake documents through an application; however, it is unclear to the Court who she was referring to when she stated "they."

there is credible evidence of sexual abuse, other similarly grave physical or psychological abuse, death threats, or serious neglect." *Id.* at 607-08. The third type of cases "fall somewhere in the middle, where the abuse is substantially more than minor, but is less obviously intolerable." *Id.* at 608. The Sixth Circuit continued, "Whether, in these cases, the return of the child would subject it to a 'grave risk' of harm or otherwise place it in an 'intolerable situation' is a fact-intensive inquiry that depends on careful consideration of several factors, including the nature and frequency of the abuse, the likelihood of its recurrence, and whether there are any enforceable undertakings that would sufficiently ameliorate the risk of harm to the child caused by its return." *Id.*

In reviewing the evidence, the Court finds that the alleged abuse in this case insufficient to establish that there is a grave risk that returning the Child would expose her to physical or psychological harm or otherwise place her in an intolerable situation. Here, while the testimony differed regarding Petitioner's abuse toward Respondent, what was consistent throughout the testimonies is that Petitioner did not physically abuse the Child.[6] Nor is there any evidence that Petitioner verbally abused the Child.[7] *See Whallon v. Lynn*, 230 F.3d 450, 460 (1st Cir. 2000) (stating that a husband's "verbal abuse and an incident of physical shoving" directed at his wife did not establish a grave risk to the child, especially where there was no allegation that the father had abused the child physically or psychologically). To be sure, at one point during direct examination, Respondent stated that Petitioner slapped the Child on the back. On cross

---

[6] At one point, Respondent testified that she was afraid that her oldest son would sustain abuse. However, the only testimony regarding physical abuse toward Respondent's son was that Petitioner pulled his ears. Without any corroboration or further explanation, the Court is unable to conclude the frequency that this occurred or whether this action(s) constitutes abuse. Moreover, Petitioner's behavior was not directed toward the Child at issue.

[7] In Respondent's credible fear interview, she states that Petitioner mistreated her children and that he yelled at both children. [Ex. 3]. Again, there was no testimony explaining or giving context to this statement.

examination, however, Respondent testified that Petitioner pushed the Child to the side but that he had never hit the Child. While the parties' arguments occurred in front of the Child, the Court finds that Respondent has failed to demonstrate by the clear and convincing standard that the Child would be subjected to a grave risk of physical or psychological harm if she returned to Honduras.

While the Court does not take allegations of abuse toward Respondent lightly, the Court does note the inconsistency regarding the frequency and nature of the alleged abuse. For instance, during her testimony, Respondent characterized the physical abuse as occurring on a "regular basis," but she only testified as to a few general incidents (i.e., he shook her, grabbed her, and kicked her in the back, grabbed her face, and hit her on the leg). The police report describes the physical abuse as "very often," violent, and aggressive. The credible fear interview, however, states that the first time Petitioner physically hit Respondent was on her calves. The next time, which was also the last time, was when Petitioner hit Respondent in the face. Given the inconsistency, the Court is left speculating how often such abuse actually occurred and the extent of such abuse. With such speculation, the Court cannot find that Respondent has met her clear and convincing burden. *McManus v. McManus*, 354 F. Supp. 2d 62, 69-70 (D. Mass. 2005) (two incidents of a mother striking two of her four children and a generally chaotic home environment did not establish a "sustained pattern of physical abuse"); *Foster v. Foster*, 654 F. Supp. 2d 348, 361 (W.D. Pa. 2009) (ordering the child's return despite finding petitioner verbally abused respondent and physically abused her on at least two occasions, along with spanking, name-calling and using physical discipline against his children). The Court has also considered the alleged verbal abuse in this case, including the death threats. Again, the Court does not take such allegations lightly, but given the totality of the circumstances, the Court finds no grave risk to the Child. Such statements were not made to the Child and the Court does not find that Respondent

has sustained her burden in showing that there was a pattern of abuse as opposed to sporadic incidents. The Court further observes that Respondent did not report any death threats to the police when she filed the police report.

Further, the Court finds Respondent's allegations are in stark contrast with the facts in *Simcox*, wherein the Sixth Circuit found sufficient evidence to satisfy the grave risk defense. In *Simcox*, the evidence showed that the nature of the abuse toward the children was physical and included beatings, hair pulling, ear pulling, and belt-whipping. 511 F.3d at 608. In addition, there was evidence of psychological abuse, including profane outbursts and abuse of the children's mother in their presence. *Id.* Further, a psychologist examined the children amd found that all of the children, except the youngest, were suffering from some level of post-traumatic stress disorder. *Id.* The Sixth Circuit described this case as a "close call," but ultimately found that the respondent established by clear and convincing evidence that the return would present a grave risk of harm. *Id.* at 609. The Sixth Circuit remanded the case to the district court to determine if there were any undertakings that would be sufficient to ensure the safety to the children upon their return to Mexico. *Id.* at 610.

The facts in this case are much different than in *Simcox*. Here, there are no credible allegations that Petitioner physically or verbally abused the Child and the allegations concerning Petitioner's abuse toward Respondent are too inconsistent for the Court to find Respondent met her high burden. Further, Petitioner testified that he would obey a custody order from a Honduras court, and there is no evidence to the contrary. Accordingly, the Court finds that Respondent has not met her burden in establishing that returning the Child constitutes a grave risk.

Finally, Respondent asserts that the inability of the courts in Honduras to properly adjudicate custody creates an intolerable situation because gender discrimination is incorporated

into Honduran law.   While the Court will further analyze Honduran law below, the Court observes that Respondent fails to explain how such law creates an intolerable situation for the Child.   There is no credible evidence that Petitioner harmed the Child or threatened to harm the Child.   Further, and as explained below, although Honduran law states that the father will generally be granted custody, the law also provides exceptions to this law.   In addition, custody determinations are not before this Court.

### 2.   Fundamental Principles

Pursuant to Article 20 of the Hague Convention, the return of a child may be refused if it would not be permitted by fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.   Respondent states that it would violate the Due Process of Equal Protection Clauses of the United States Constitution to require the return of the Child where the mother faces legally sanctioned discrimination upon return and that it would cause the Child to be placed in an intolerable situation since custody would be determined based on discrimination.   In support of her argument, Respondent states that Honduran law provides that children will generally be left in the custody of the father.

The Court finds that Petitioner has not shown by clear and convincing evidence that the return of the Child violates the fundamental principles of the United States.   Courts have explained that this defense is to be restrictively interpreted and applied when on the "rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process." *Walker v. Kitt*, 900 F. Supp. 2d 849, 863 (N.D. Ill. 2012) (quoting *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 614 (E.D. Va. 2002), *aff'd*, 52 F. App'x 207 (4th Cir. 2002)).   Here, Respondent emphasizes Article 194 of Honduran law, which provides as follows:

> If the parents cannot agree as to the guardian and child care, or be
> contrary to the material rights or moral interests of the children, the

matter will be decided by a competent court, which shall be guided
to resolve the matter in a manner only and most beneficial to the
child. Similarly, it will generally rule that the children be left in the
custody of the father in whose company they have been up to the
moment of the disagreement, preferring the father if they were in the
company of both except in any case where there are reasons which
warrant any other solution.

[Doc. 1-1 at 60].

While Respondent argues that her parental rights would be diminished because of her gender based on operation of the law, the Court finds that the law does not shock the conscience and that "merely offending principles espoused" in the United States is insufficient to invoke the Article 20 exception." *Habrzyk v. Habrzyk*, 759 F. Supp. 2d 1014, 1027 (N.D. Ill. 2011) (stating that the "Convention requires that the fundamental principles of the State *not permit* the return of the child; merely offending principles espoused in Illinois laws is insufficient"); *see also March v. Levine*, 136 F. Supp. 2d 831, 855 (M.D. Tenn. 2000), *aff'd*, 249 F.3d 462 (6th Cir. 2001) (explaining that "it should be emphasized that this exception, like the others, was intended to be restrictively interpreted and applied, and is not to be used, for example, as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed") (quoting 51 Fed. Reg. at 10510); *Walker v. Kitt*, 900 F. Supp. 2d 849, 864 (N.D. Ill. 2012) ("To invoke Article 20 to refuse to return a child for anything less than gross violations of human rights would seriously cripple the purpose and effectivity of the Convention."). Here, there is simply no evidence that the Child's human rights and fundamental freedoms would be in jeopardy if returned to Honduras.

## III.	CONCLUSION

As a final matter, the undersigned emphasizes that this is not a custody determination, but instead, a conclusion that any custody determination should be made by a Honduras court. Accordingly, the Court finds that the Petition for the Return of the Child [Doc. 1] shall be **GRANTED**.  The Child **SHALL** be returned to Honduras to allow a Honduran court to determine who shall have custody of the Child.  Respondent **SHALL** return the Child to Honduras, the Child's habitual residence.  The parties **SHALL** contact Chambers to set a hearing to address the means and manner of the Child's return to Honduras.


ORDER ACCORDINGLY:

_____ s/ C. Clifford Shirley, Jr.___
United States Magistrate Judge